UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| LORI E.,<br>   *Plaintiff*,<br><br>  v.<br><br>KILOLO KIJAKAZI, Commissioner of<br>Social Security,[1]<br>   *Defendant*. | Case No. 1:20-cv-00878-MSN-IDD |

## MEMORANDUM OPINION & ORDER

This matter comes before the Court on the parties' cross-motions for summary judgment (Dkt. Nos. 15, 17).[2] Plaintiff Lori E. seeks judicial review of the final decision of defendant Kilolo Kijakazi, Commissioner of the Social Security Administration, finding that she is not disabled under sections 216(i) and 223(d) of the Social Security Act, 42 U.S.C. § 423 (the "Act"). For the reasons stated below, the Court will DENY plaintiff's Motion for Summary Judgment (Dkt. No. 15), GRANT defendant's Motion for Summary Judgment (Dkt. No. 17), and AFFIRM the Administrative Law Judge's ("ALJ") decision.[3]

---

[1] Kilolo Kijakazi is the Acting Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d). *See also* section 205(g) of the Social Security Act, 42 U.S.C. § 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

[2] Plaintiff filed a second motion for summary judgment on the same day she filed her opposition to defendant's cross-motion for summary judgment. *See* Dkt. No. 21. Plaintiff neither sought leave to file that successive motion for summary judgment, nor filed it within the timeframe set forth in the Court's scheduling order. *See* Dkt. No. 10. Plaintiff previously was reminded "that *pro se* litigants must follow all rules and procedures set forth in the Local Rules of this Court and the Federal Rules of Civil Procedure." *See* Dkt. No. 27. Accordingly, the Court only will adjudicate plaintiff's initial motion for summary judgment—filed on May 12, 2021. However, and to the extent necessary, the Court will consider the arguments put forth in plaintiff's second motion for summary judgment insofar as they can serve as a reply in support of plaintiff's initial motion and in opposition to defendant's motion.

[3] The Administrative Record ("AR") in this case has been filed under seal, pursuant to Local Civil Rules 5 and 7(C). *See* Dkt. No. 14. In accordance with those rules, this order excludes any personal identifiers such as plaintiff's full name, social security number and date of birth (except for the year of birth), and the discussion of plaintiff's medical information is limited to the extent necessary to analyze the case.

## I.    Background

On December 29, 2016, plaintiff filed for disability insurance benefits with an alleged onset date of July 21, 2016. AR at 181–82. The Social Security Administration ("SSA") denied plaintiff's application on May 18, 2017 and, on November 30, 2017, upheld that decision upon reconsideration. *Id.* at 195–96, 212–13.

On April 1, 2019, plaintiff appeared before ALJ Suzette Knight for a video hearing to challenge the SSA's determination. *Id.* at 62. Plaintiff, appearing *pro se*, testified at that hearing as did her husband and a Vocational Expert ("VE"). *Id.* On June 25, 2019, the ALJ issued a decision finding that plaintiff was not disabled under the Act, even though she suffered from chronic fatigue syndrome, post viral syndrome, postural orthostatic tachycardia syndrome,[4] rheumatoid arthritis, and obesity. *Id.* at 34. The Appeals Council found no basis to review and affirmed the ALJ's decision. *Id.* at 1.

Having exhausted her administrative remedies, plaintiff filed a *pro se* Complaint with this Court on July 31, 2020, challenging the ALJ's decision. (Dkt. No. 1). Plaintiff filed a Motion for Summary Judgment (Dkt. No. 15) on May 12, 2021, including a Memorandum in Support of Plaintiff's Motion for Summary Judgment (Dkt. No. 18). Defendant filed a Cross-Motion for Summary Judgment (Dkt. No. 17) on June 11, 2021, along with a Memorandum in Support of Defendant's Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment (Dkt. No. 18). Accordingly, the parties' motions are ripe for disposition.

---

[4] This condition also is referred to as POTS.

## II.      Evidence before the ALJ

Below is a summary of plaintiff's testimony before the ALJ and other evidence in the administrative record.

### A.      Testimony at the Administrative Hearing

At the video hearing on April 1, 2019, plaintiff appeared *pro se* before the ALJ. AR at 63. Plaintiff was fifty-seven years old, 5'1" tall, and weighed 172 pounds. *Id.* at 74. She lived in a three-story house with her husband. *Id.* at 75. Her highest level of education was graduate school. *Id.* at 77.

Plaintiff testified that in the period immediately before her alleged onset date, she worked as a contract administrator for a nonprofit organization. *Id.* She confirmed that she held similar positions with other employers in different industries for the preceding ten years. *Id.* at 78–79. And before that, plaintiff told the ALJ she had served for more than twenty years as a senior manager in the telecommunications field, including with Nextel Wireless and AT&T. *Id.* at 79–82.

Plaintiff then explained that she had not applied for any jobs since her alleged onset date of July 21, 2016, because she suffers from "a very complex" neurological disease affecting her brain, autonomic function, immune system, and cardiovascular system. *Id.* at 83–84. In addition, plaintiff described suffering from severe orthostatic intolerance. *Id.* at 84. Plaintiff testified that the primary side effects from that constellation of disorders included extreme fatigue, "word-find difficulties," and "[s]hort-term memory problems." *Id.* at 84–85. Plaintiff stated that most limiting, however, were her myalgic encephalomyelitis/chronic fatigue syndrome ("ME/CFS") crashes which could leave plaintiff "basically bedridden for over two months." *Id.* at 86. Plaintiff further testified that her inability to manage such crashes was exacerbated by the fact that only "a handful of doctors in this country," meaning "five to seven . . . even know anything about [ME/CFS] and

can treat it." *Id.* And despite this limited number of doctors capable of diagnosing and managing ME/CFS, plaintiff stated that "[t]here is no cure [for it]. There is no effective or standard treatment." *Id.* at 86.

In terms of a typical day in her life, plaintiff testified that immediately upon waking up, she takes a supplement (glutathione), drinks sixteen ounces of Pedialyte or twelve ounces of V8-branded juice, waits "about a half-hour or so" to see if she feels "strong enough to get up out of bed" and then, if she does, goes downstairs to take additional supplements. *Id.* at 94. After that, plaintiff stated she makes herself breakfast (always two eggs and toast), waits an additional thirty minutes, takes her second set of vitamins and medication, waits for those supplements to "kick in", drives to a stable so that she can feed and "turn out" her pony, returns home to "sit down in the family room" and watch television or listen to the news, makes herself lunch (often a frozen meal), takes additional supplements, lies down and experiences a "mini-crash", takes an additional supplement, returns to the stable to "bring the pony in", feed her, and potentially "pick her hooves", and then returns home. *Id.* at 95–96.

Regarding her personal care, plaintiff testified that she only is able to take a shower "every three to four days" and that although she formerly "used to get [her] hair done every six to eight weeks," she now only "get[s it] done maybe three or four times a year." *Id.* at 96. As for household chores, plaintiff testified it would be a "good week" if she did one load of laundry but that she no longer loads or unloads the dishwasher, does not vacuum, and is unable to do more than "pick up a few groceries" and run "very limited" errands. *Id.* at 97.

Plaintiff's husband testified to the same effect. That is, plaintiff's husband also stated that plaintiff "can maybe do 10% of what she used to be able to do" and that if plaintiff "tries to do too much, if she presses herself to go shopping, go to the store, she usually has a crash where it might

take a day[,] [i]t might take several days for her to get back to the point where she can go out and spend those couple hours out every day." *Id.* at 100–01.

In testimony from the VE, it was established that plaintiff's prior work experiences were sedentary jobs with Specific Vocational Preparation levels of eight. *Id.* at 104. The ALJ then described the following hypothetical person for the VE to consider: The hypothetical person had plaintiff's same vocational profile in terms of age, education, and work experience and was limited to a light exertion level, with the additional limitations that the individual could occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; occasionally work at unprotected heights; occasionally work around moving mechanical parts; and could tolerate occasional exposure to humidity, extreme cold, and extreme heat. *Id.* at 104–05.

The VE testified that the following positions existed in the national economy that satisfied the limitations set forth by the ALJ: routine office clerk (65,000 jobs), administrative clerk (75,000 jobs), and general file clerk (100,000 jobs). *Id.* at 105.

The ALJ then modified the limitations placed on the hypothetical person, such that the individual could only occasionally balance; never work at unprotected heights or around moving parts; could never be exposed to extreme temperatures; could tolerate moderate noise levels and occasional exposure to pulmonary irritants; and would be off task "5% of an 8-hour workday due to fatigue" in addition to normal breaks. *Id.* at 106. The VE testified that the same positions existed in the national economy for such a person. *Id.*

The ALJ then added the further limitation that allowed the hypothetical person to stand and/or walk for no more than four hours in an eight-hour workday. *Id.* The VE responded that such

additional restrictions would "reduce the numbers of all the positions by 10 to 15%." *Id.* at 106–07.

Finally, the ALJ asked the VE what impact there would be on the positions available to the hypothetical person if that person also could perform work only at the "sedentary" level. *Id.* at 107. The VE responded that such a person could work as a general receptionist (100,000 positions available in the national economy), a general appointment clerk (120,000 positions available), and an information clerk (95,000 positions available).

### B.     Record Evidence

The medical and administrative evidence documents the following history of plaintiff's treatment for her concurrent impairments both before and after her alleged onset date.[5]

<u>Prior to Alleged Onset Date</u>

Before her alleged onset date, plaintiff's primary source of discomfort was chronic neck and back impairments traceable to two prior automobile accidents.[6] *See, e.g.*, *id.* at 492–508. On April 10, 2015, plaintiff reported to Insight Imaging with neck and back pain, including radiculopathy. *Id.* at 137–38. Dr. Scot A. Lebolt noted a normal examination regarding plaintiff's thoracic spine, but mild spondylosis with respect to plaintiff's cervical spine. *Id.* On April 23, 2015, plaintiff received a diagnosis of "lumbar facet arthropathy and lumbar foraminal stenosis" along with "cervical disc herniation and cervical spondylosis." *Id.* at 490. Plaintiff's records reflect that "[n]o further imaging of [her] spine has been performed since 2015." *Id.* at 142.

---

[5] The Court notes that plaintiff included in the administrative record her own narrative explanations of her medical records, past diagnoses, and test results. *See, e.g.*, *id.* at 142, 150–56. Similarly, plaintiff included in the administrative record articles and circulars regarding the impairments plaintiff has identified. *See, e.g.*, *id.* at 156–180. Although the Court has reviewed all such materials, the Court will constrain its discussion to the actual medical records provided when reciting the medical evidence before the ALJ.

[6] The first accident occurred in 1992; the second accident on February 6, 2015. AR at 497.

On March 4, 2016, plaintiff reported to the Fauquier Hospital Emergency Department for a "near-syncope" episode after she donated blood. *Id.* at 713. Plaintiff reported she had not lost full consciousness during this episode but had experienced nausea and sweatiness. *Id.* At the time plaintiff received this emergency medical attention, however, she "fe[lt] much better." *Id.* Plaintiff reported to the treating physician that she had decreased her food and fluid intake over the prior "several days," which may have contributed to her reaction. *Id.* Plaintiff was discharged after showing she could "ambulate[] with a steady gait" and was advised to drink fluids and follow up with her primary care physician as necessary. *Id.* at 716.

On July 5, 2016, plaintiff's then-primary care physician (Dr. Jae Lee) referred plaintiff to Dr. Parita Vasa of the Arthritis and Osteoporosis Center for "an initial rheumatologic consultation." *Id.* at 680. Dr. Vasa described plaintiff as "a very pleasant 55 year old lady" who had "periods of body pain and fatigue" that worsened after her February 2015 car accident. *Id.* Plaintiff also stated she previously had "passed out after donating blood and felt that it took her body weeks to recover . . . ." Additionally, Dr. Vasa noted that plaintiff stated she felt "exhausted at times" and was positive for "non-restorative sleep." *Id.*

From Alleged Onset Date

Beginning around July 22, 2016, plaintiff "developed symptoms suggestive of a respiratory infection." *Id.* Near that time, she "called 911 when she experienced acute-onset dizziness / vertigo, palpitation, tinnitus, and nausea." *Id.* EMS, however, did not transport plaintiff to seek medical attention. *Id.* at 595.

On July 30, 2016, Dr. Kenneth L. Larsen in the Fauquier Hospital Emergency Department treated plaintiff for "an illness characterized by 6–8 days of episodic moderate to severe vertigo brought on by changes in position or movement of [the] head." *Id.* at 699.

On August 1, 2016, plaintiff visited "Patient First" in Gainesville, Virginia complaining of "nausea, chills, shakes, fatigue, and anxiety attacks" that began approximately ten days prior. *Id.* at 512. Dr. Amardeep S. Athwal diagnosed plaintiff with "[p]ossible viral illness causing symptoms," and lab results from three days later confirmed that plaintiff's "[p]arvovirus test" was "positive for past exposure or immunity." *Id.* at 514.

On August 4, 2016, plaintiff visited the emergency department of the Haymarket Medical Center, where she was seen by Dr. Karla I. Lacayo. *Id.* at 585. Plaintiff presented with "generalized weakness and fatigue" and reported that she had "not been feeling well since [July 19, 2016] after she returned from a trip to Miami." *Id.* Plaintiff continued that she had "nausea, palpitations, and shakiness on [July 25, 2016]" and had "tested positive for parvovirus infection." *Id.* at 585–86. As for symptoms, plaintiff told Dr. Lacayo that she had a "generalized 'heavy feeling' that [wa]s worse in the mornings and g[o]t[] better as the days go on." *Id.* at 586. Dr. Lacayo then discussed plaintiff's condition with "Dr. Saberinia, endocrinologist" who "[s]uspect[ed plaintiff] may have sick euthyroid disease as a consequence of recent parvovirus infection." *Id.* at 592. Specifically, plaintiff's "thyroid hormones were found to be very low" which "[wa]s probably what [wa]s contributing to [he]r weakness and may have been triggered by the viral infection, parvovirus[, she was] recently diagnosed with." *Id.* at 1034.

On August 18, 2016, plaintiff was seen by Dr. Henry H. Rhee of Infectious Diseases Specialists of Virginia, LLC. *Id.* at 617. There, plaintiff described "an underlying history of fibromyalgia" and symptoms of "dizziness and generalized weakness[, and] . . . fatigue and joint pain," as well as her positive lab results for "[h]uman parvovirus B19 IgM/IgG." *Id.* Dr. Rhee assessed plaintiff with "[o]ther fatigue" and his treatment plan read: "[Plaintiff's] symptoms

8

should gradually improve with time. If her symptoms do not improve, she was welcome back for a more complete workup." *Id.* at 619.

The same day, plaintiff returned to Dr. Vasa for an "initial consult follow-up." *Id.* at 678. There, plaintiff informed Dr. Vasa of her "positive parvovirus serology IgM and IgG as well as low TSH." *Id.* In response, Dr. Vasa stated her belief that "symptoms of myalgias and fatigue could certainly be related to . . . [plaintiff's] new diagnosis of acute parvovirus." *Id.* at 679. Dr. Vasa concluded her notes by recommending a three-month follow up appointment. *Id.*

On August 26, 2016, Dr. Shabnum Haleem examined plaintiff as part of a "new p[atien]t consult" at Bluemont Nephrology Associates. *Id.* at 867. There, plaintiff reported "recent infection with Parvovirus B19[,] dizziness[, and] heaviness in legs." *Id.* Dr. Haleem diagnosed chronic kidney disease" attributable to plaintiff's history of non-steroidal anti-inflammatory drug use. *Id.* at 869.

On September 13, 2016, plaintiff visited Department of Health & Humans Service's "bone marrow failure hematology clinic for a second opinion regarding results of a parvovirus B19 serological test performed at her local provider's office in the context of multiple debilitating symptoms experience[d] over the past two months." *Id.* at 532. Specifically, plaintiff reported that "she ha[d] suffered from extreme fatigue, headache, insomnia, palpitations, tinnitus and a persistent sense of imbalance" since the onset of her symptoms. *Id.* On examination, plaintiff was "hypertensive . . . [but o]ther vital signs were normal." *Id.* At the conclusion of their examination, Drs. Kazusa Ishii and Neal S. Young wrote: "In summary, [plaintiff]'s parvovirus B19 serological tests indicate prior exposure but no persistent or chronic parvovirus B19 infection . . . . We reassured [plaintiff] that further work-up or intervention [wa]s unnecessary for parvovirus B19 . . . . Importantly, her ongoing debilitating symptoms are not due to parvovirus B19." *Id.* at 533.

Additionally, Drs. Ishii and Young "explained to [plaintiff] that whether or not symptoms were initially triggered by viral infection would not change the[ir] management at this time." *Id.*

On September 6, 2016, plaintiff visited Dr. Michael Ackerman for the first time. *Id.* at 573. Dr. Ackerman noted that plaintiff described suffering from "extreme fatigue" and that she had been "out of work since July 25th." *Id.* In addition, Dr. Ackerman recorded that plaintiff "normally sees Dr. [Jae Y.] Lee who wouldn't do any further testing on her" and that she "[h]ad some travel on July 10th when she flew down to Miami then approximately a week or so later [wa]s when she developed s[ymptoms]. She raised the idea of Zika virus to multiple doc[tor]s but no one ha[d] tested her." *Id.* Dr. Ackerman described plaintiff's general appearance as "pleasant, alert, oriented, and . . . [in] no apparent distress." *Id.* at 577. He assessed plaintiff with suffering from post-viral syndrome, a cough, and shortness of breath. *Id.* at 580. He concluded that he "suspect[ed] that [plaintiff's] viral infection has triggered an[] autoimmune response in some way causing some of these [symptoms] for he[r]." *Id.* at 581.

On September 16, 2016, plaintiff was seen by Dr. Ackerman for a "follow up of her symptoms and review of her lab evaluation from last week." *Id.* at 564. Dr. Ackerman noted that plaintiff reported "continued severe fatigue and her tinnitus with eustachian tube dysfunction." *Id.* Specifically, plaintiff reported "[h]er fatigue [wa]s severe and she [wa]s limited in her activities of daily living. Often she [wa]s too tired to shower and she c[ould] only tolerate being out of the house for a few hours as she w[ould] get rapidly fatigued. She doesn't shower regularly and [activities of daily living] such as cleaning w[ould] exhaust her. In fact even mild exertional strain cause[d] . . . exhaustion." *Id.* Dr. Ackerman, in turn, noted plaintiff's general appearance as "fatigued." *Id.* at 568. He assessed plaintiff with "[p]ost viral syndrome[; d]izziness[; and m]alaise and fatigue." *Id.* He offered the following plan:

> Putting the whole picture together given the time frame of events and positive serologies for both parvovirus IGM and [Epstein-Barr Virus] it would appear that [plaintiff] is suffering with a type of post viral syndrome whose symptoms include extreme exhaustion after mild to moderate exertion and dizziness. Her [Epstein-Barr Virus] titers suggest convalescence from the virus which again would make sense given the fact that she's been sick since August and we wouldn't expect her IGM to be positive at this point. Her parvovirus was low level IGM but if she was infected with parvovirus and [Epstein-Barr Virus] during the same time frame it might explain her severe symptoms and difficulty recovering quickly.

*Id.* Dr. Ackerman's prognosis stated he was "hopeful that [plaintiff] w[ould] make a complete recovery given that both viral infections [we]re not considered chronic disease states." *Id.*

On October 3, 2016, Dr. Ackerman reexamined plaintiff as part of a "follow up" appointment. *Id.* at 555. He noted plaintiff reported "[h]er fatigue ha[d] improved slightly as she'[d] been] having some good days now whereas previously she had no days of energy." *Id.* Dr. Ackerman described plaintiff as "pleasant, alert, oriented, and [in] N[o] A[pparent] D[istress]." *Id.* at 559. He assessed plaintiff with "[p]ost viral syndrome" and "[t]innitus of both ears." *Id.* at 563. Dr. Ackerman's records from that visit concluded: "Overall [plaintiff] seem[ed] to be doing slightly better . . . so [he was] hopeful she w[ould] continue to make further strides in that direction." *Id.*

The same day, Dr. Ackerman prepared a letter that detailed plaintiff's symptoms and treatment, and his "opinion that [plaintiff's] original Parvovirus infection coupled with the possible reactivation of Epstein Barr ha[d] caused [plaintiff's] profound fatigue along with her continued vertigo which is also associated with tinnitus." *Id.* at 982. The letter also repeated plaintiff's subjective reports that her "fatigue is daily but especially bad in the afternoon when she [is] basically unable to do anything but rest in bed." *Id.* 982. Dr. Ackerman concluded that "there is no known cure for this other than hopeful anticipation of recovery and rest" and that "[t]here [wa]s no way of knowing at this point how long [plaintiff's] disability [could] last but [he would] say

11

that [plaintiff] w[ould] most likely continue to be disabled[,] in [his] opinion[,] for another month until [November 13, 2016]." *Id.*

On October 10, 2016, plaintiff was referred to Dr. Ashkan Monfared for her "dizziness and tinnitus." *Id.* at 637. The focus of that visit was plaintiff's vestibular migraines, which Dr. Monfared suggested treating with a "migraine supplements regiment for the next 3 months." *Id.* at 639.

On November 9, 2016, plaintiff visited Dr. David J. Eisenman at University of Maryland School of Medicine's Department of Otorhinolaryngology, Otology, and Neurotology. *Id.* at 652. The focus of the visit was plaintiff's tinnitus "following a virus in July 2016," the symptoms for which led Dr. Eisenman to order testing and "see [plaintiff] back after those ha[d] been completed." *Id.* at 656, 657.

On November 15, 2016, plaintiff returned to Dr. Rhee for a follow-up visit. *Id.* at 620. Her "chief complaint" then was "fatigue" even though "[o]verall, she ha[d] improved somewhat." *Id.* Dr. Rhee again assessed plaintiff with "[o]ther fatigue" and stated in his treatment plan that plaintiff was "doing somewhat better" and should follow up with her "ENT and otoneurologist[, and] . . . Dr. Ackerman." *Id.* at 622.

On November 17, 2016, plaintiff again saw Dr. Vasa after "continu[ing] to have worsening exhaustion and fatigue since she [had] last [visited]." *Id.* at 674. Dr. Vasa noted that in the intervening months, plaintiff had changed her primary care physician to Dr. Ackerman—who had "found positive titres of [Epstein-Barr Virus]" which he "thought . . . was reactivation." *Id.* Dr. Vasa recorded plaintiff's "biggest complaints [as] the fatigue, tinnitus, and imbalance." *Id.* Dr. Vasa then listed plaintiff's "large constellation of symptoms" and the "many specialists" plaintiff

had consulted regarding the same. *Id.* at 675. Dr. Vasa continued that on the record before her, she "still d[id] not feel [she was] seeing any evidence of rheumatoid arthritis." *Id.*

On November 21, 2016, plaintiff returned to Dr. Ackerman. *Id.* at 546. Plaintiff reported that she "continue[d] to remain fatigued and ha[d] to parse her day out in terms of how much she c[ould] do." *Id.* Plaintiff also stated she had "tried to get into JHU and UVA into the I[nfectious] D[iseases] clinic" and Dr. Ackerman commented, "apparently both facilities have denied seeing her[, but f]or some reason there is no documentation from either of these institutions." *Id.* Dr. Ackerman assessed plaintiff as suffering from "[m]alaise and fatigue" along with "[p]ost viral syndrome." *Id.* at 553. He noted: "At this point we are really just in a holding pattern with [plaintiff] as her fatigue is slowly improving on it's [*sic*] own" and that he "continued to believe that this was a combination of reactivation of E[pstein ]B[arr ]V[irus] perhaps related [to] exposure to parvovirus b19." *Id.*

On December 21, 2016, plaintiff again visited Dr. Vasa and reported being fatigued. *Id.* at 624. Dr. Vasa wrote that plaintiff was "manifesting symptoms of rheumatoid arthritis" but noted "[t]his still does not explain her other issues of tinnitus, etc[.] and she will continue to work with her other providers for that work-up." *Id.*

On January 9, 2017, Dr. Monfared again examined plaintiff "for dizziness and tinnitus" at the "request" of Dr. Christopher Chang (plaintiff's ENT). *Id.* at 634. Dr. Monfared noted that plaintiff reported "doing well" and had said "this week ha[d] been especially good." *Id.* Plaintiff attributed this positive development to dietary changes. *Id.* Dr. Monfared recommended against ordering an MRI at that time and instead (again) suggested plaintiff take a "migraine supplements regiment for the next 3 months." *Id.* at 363.

13

On January 26, 2017, plaintiff visited Dr. Ackerman and reported that running "some errands" had "wiped out her out the next day" and that she "fe[lt] like she functions at 20% due to her chronic fatigue and myalgia, various joint pain." *Id.* at 537. Dr. Ackerman assessed plaintiff to have "[m]alaise and fatigue[;] [t]innitus of both ears[; and r]heumatoid arthritis." *Id.* at 545.

On February 16, 2017, plaintiff returned to the University of Maryland School of Medicine's Department of Otorhinolaryngology, Otology, and Neurotology. *Id.* at 657. Dr. Chelsea G. Carter treated plaintiff there and noted that plaintiff had reported "recently improved" symptoms regarding the "imbalance/unsteadiness" she had experienced "following a virus in July 2016." *Id.* at 657. On examination, Dr. Carter recorded readings within "normal limits" and suggested plaintiff follow up with Dr. Eisenman "as scheduled." *Id.*

On February 22, 2017, plaintiff returned to Dr. Vasa. *Id.* at 666. Dr. Vasa noted that plaintiff "did not try the medications" previously recommended to her and that plaintiff's "[h]and joint pain and stiffness persist[ed]." *Id.* Even so, plaintiff reported that pain was "much better than when she [visited Dr. Vasa] in December." *Id.* Plaintiff's fatigue, however, remained a "[m]ajor problem." *Id.* Dr. Vasa noted that such fatigue likely was "multifactorial" and that although rheumatoid arthritis "could be contributing" to it, Dr. Vasa did not "think it [wa]s solely responsible for [plaintiff's] symptoms." *Id.* at 668.

On March 6, 2017, plaintiff completed an SSA-provided "Fatigue Questionnaire." *Id.* at 339–40. Plaintiff wrote that she began experiencing fatigue after becoming ill with "a viral infection in July 2016" and explained that her "[r]heumatologist believe[d] [plaintiff's] chronic fatigue [wa]s 'multifactorial.'" *Id.* at 339. When asked how her fatigue affected her life, plaintiff stated she "fe[lt] fatigued every day but especially after performing a physical activity and it often t[ook] 3–4 days to recover." *Id.* Plaintiff continued that her fatigue "affected every aspect of [her]

14

life. [She] c[ould] no longer work out as [she] ha[d] for years not only to stay fit but to deal with [her] chronic neck and back problems including 2 herniated discs in [her] neck." *Id.* In addition, plaintiff stated she could not "do any household chores or yardwork" and only could "shower or bathe every other day or every 3rd day." *Id.* In terms of her other activities of daily life, plaintiff stated she made breakfast for herself every day (before her energy would start to fade), drove to-and-from a stable to "feed/care for [her] horses," "run occasional errands" five minutes from her house, and attend "some doctor appointments." *Id.* Plaintiff also stated she no longer could "clean [her] house" or yard, shop at the mall, or socialize. *Id.* In addition, plaintiff described chronic difficulty sleeping through the night and stated she needed to "rest and/or nap every day; usually between 10AM–4PM." *Id.* at 340. Plaintiff concluded this form by explaining she was "operating at about 35% of what" she previously could handle and that "[i]f [she] didn't have responsibilities, in terms of feeding and caring for [her] animals, [she] wouldn't push [herself] to get out of bed each day . . . ." *Id.* at 341.

On March 6, 2017, plaintiff also completed an SSA-provided "Function Report." *Id.* at 352–59. In it, she described her daily routine as follows:

> Wash face. Brush teeth. Prepare breakfast (usually ½ bagel and 2 eggs). Feed dog & cats. Let dog out. Take vitamins and supplements. Get dressed. Go feed horses. Let horses out. Prepare stalls for evening. Go home. Take mid-morning snack and more vitamins/supplements. Rest or take a nap. Eat lunch. Take more vitamins/ supplements/Rx medicine. Rest or nap again. Go bring in horses and give evening feed. Go home. Eat dinner. Take vitamins. Watch T.V. Go to bed.

*Id.* at 352. Plaintiff also noted that "on [her] way home from feeding the horses, [she] may stop in town on occasion to pick up some groceries, pick up Rx from CVS, etc. but only if [she] is physically able to [do so] that day." *Id.* In addition, plaintiff wrote: "If I'm able, I may do a load or two of wash each week." *Id.*

In terms of her personal care, plaintiff stated that "on a typical day" she only would wear "comfortable clothes or change back into pajamas after taking care of the horses." *Id.* at 353. Plaintiff also stated she was able to bathe herself, although not with the same frequency as before, and noted that whereas she used to "blow dry/curl [her] hair every day[,] [n]ow [she] simply tie[s] it back in a ponytail wet." *Id.* Regarding her food, plaintiff stated she still "fe[d] [her]self" but stopped "cook[ing] any elaborate meals." *Id.* As for hobbies and social activities, plaintiff stated she would ride a horse one-or-two times per month and speak with her aunt by phone every day. *Id.* at 356. Otherwise, plaintiff stated she was unable to regularly engage in her hobbies or socialize with friends. *Id.* Finally, plaintiff stated she "may be able to stand for an h[ou]r one day and only 10 minutes another day." *Id.* at 357. Plaintiff concluded her responses by explaining that "[a]s a result of [her] illness, coupled with pre-existing medical issues, [she] d[id]n't have the energy or the stamina to sustain the rigors of an 8-h[ou]r workday or a 3 h[ou]r daily commute." *Id.* at 359.

On March 10, 2017, plaintiff visited Dr. Ackerman for a follow-up examination. *Id.* at 932. He assessed plaintiff with malaise and fatigue, rheumatoid arthritis, and tinnitus of both ears. *Id.* at 940. His plan of care noted that plaintiff's "fatigue continue[d] to be multifactorial (active untreated [rheumatoid arthritis], post viral, early menopause, etc[.])" but noted plaintiff "fe[lt] like things might [have] be[en] improving." *Id.* at 940.

On March 27, 2017, Dr. Ackerman again treated plaintiff and "her ongoing fatigue." *Id.* at 942. In his notes, Dr. Ackerman wrote: "[t]oday, [plaintiff] presented to essentially stress to me how tired she really is. . . . I suspect her ongoing fatigue might have something to do with her untreated [rheumatoid arthritis]. She asked me to recheck vital titers today but I don't see any utility or medical justification for this as viral levels don't typically correlate with [symptoms]." *Id.* at 950.

On April 7, 2017, plaintiff (upon Dr. Ackerman's referral) visited Dr. Hind Al Saif with the Human Genetics Clinic at the VCU Medical Center in Richmond, Virginia. *Id.* at 747. Plaintiff told Dr. Al Saif that she was "functioning around 20 percent of capacity" and that she primarily was not having "stamina" rather than suffering from "muscle weakness." *Id.* at 748. Dr. Al Saif noted that plaintiff looked "comfortable, not in distress" during their visit and found "[h]er current symptoms [we]re not suggestive of a particular inborn error of metabolism or mitochondrial disorder with absence of multi system involvement and absence of typical mitoc[h]ondrial presentation." *Id.* at 751. Dr. Al Saif concluded by referring plaintiff to "neurology and psychiatry" and to "follow[] up with rheumatology and cardiology." *Id.* at 752.

On April 13, 2017, plaintiff presented to Dr. Oral Alpan for "evaluation of chronic fatigue." *Id.* at 849. After recording plaintiff's recitation of her medical history and performing a physical examination that showed "[n]o acute distress," Dr. Alpan directed plaintiff to undergo additional testing. *Id.* at 850. Plaintiff returned to Dr. Alpan on May 2, 2017, where Dr. Alpan noted that plaintiff's "[i]mmune work up revealed low pneumococcal response" which led him to recommend "pneumococcal booster." *Id.* at 853.[7]

On May 9, 2017, plaintiff returned to Dr. Ackerman "for discussion regarding chronic fatigue" and to "catch [him] up to date on the latest developments." *Id.* at 951. On that latter point, plaintiff informed Dr. Ackerman of the specialists she had visited and told him she "th[ought] she might have POTS or some type of electrolyte imbalance as she tend[ed] to feel a lot better when she has an electrolyte drink with her." *Id.* Dr. Ackerman assessed plaintiff with malaise and fatigue,

---

[7] Plaintiff also visited Dr. Alpan on June 21, 2017, where plaintiff informed Dr. Alpan she was "concerned that she may be fighting off infections from Coxackie, EBV, HHV6 or Chlamydial pneumoniae." *Id.* at 1266. Dr. Alpan reported that he "discussed" with plaintiff that her symptoms "may be related to a mast cell disorder" and agreed to check to confirm the same and also try treating the symptoms with medication. *Id.* at 1267.

along with costochondral junction syndrome, and stated he was awaiting the test results ordered by plaintiff's specialists. *Id.* at 959.

On May 18, 2017, Dr. Raj Manchandani examined plaintiff—who had referred herself—to address the chief complaint of "low blood volume." *Id.* at 918. Dr. Manchandani assessed plaintiff with chronic fatigue and an Epstein-Barr Virus infection. *Id.* at 921.

Also on May 18, 2017, the SSA's Disability Adjudicator concluded that plaintiff "ha[d] lumbar stenosis, cervical spondylosis, dizziness, Eustachian tube dysfunction, vestibular migraines, R[heumatoid] A[rthritis], tinnitus, and chronic fatigue." *Id.* at 190. The Disability Adjudicator further noted that "[p]hysical exams have been largely within normal limits" and that "a light RFC," therefore, "[wa]s proposed." *Id.* In so concluding, the Disability Adjudicator observed that plaintiff "reported she has an appointment with a cardiologist on [May 25, 2017]" but that "[g]iven [plaintiff's] extensive workups by various specialists, it [wa]s not expected that this visit w[ould] provide any medical evidence that would change the determination regarding [plaintiff's] residual functional capacity, so the adjudication proceeded without waiting for this information." *Id.*

State agency doctors Daniel Walter and Gene Godwin provided the Disability Adjudicator with opinions to help her interpret the medical evidence and reach a decision. *Id.* at 191–94. Dr. Walter opined that plaintiff had "[n]o mental medically determinable impairments established." *Id.* at 191. Dr. Godwin determined the plaintiff's medically determinable physical impairments were "partially consistent" with plaintiff's statements regarding her symptoms and proposed exertional limitations in light of the same. *Id.* at 192–93. Specifically,  Dr. Godwin opined that plaintiff: occasionally could lift and/or carry twenty pounds; frequently lift and/or carry ten

pounds; sit, stand, and/or walk for about six hours in an eight-hour workday; had specific limitations "due to chronic fatigue and joint pain"; and had postural limitations. *Id.* at 193–94.

On May 24, 2017, plaintiff again was seen by Dr. Vasa. *Id.* at 1317. There was no indication that plaintiff had begun using the medication previously prescribed by Dr. Vasa. *Id.* at 1318.

On June 6, 2017, plaintiff returned to Dr. Haleem. *Id.* at 871. There, plaintiff reported "chronic fatigue and joint pain" and stated "she ha[d an] electrolyte problem and 'low blood volume.'" *Id.* at 871, 873. Dr. Haleem noted, however, that on a basic metabolic panel "no electrolyte abnormalities [we]re seen." *Id.* at 873. Dr. Haleem also recorded that plaintiff "[s]tate[d] she ha[d] seen several doctors and no one [wa]s helping her." *Id.* Dr. Haleem described plaintiff as "loud and aggressive toward [her]" during this encounter and reported that plaintiff requested tests that Dr. Haleem would not order. *Id.*

On June 19, 2017, plaintiff visited Dr. Tinatin Khizanishvili at Gastroenterology Associates, PC. *Id.* at 875. In recording plaintiff's medical history, Dr. Khizanishvili recorded that plaintiff got "very ill last year" with "every symptom under the sun" and that "[s]he ha[d] seen various specialists and changed her PCP a couple times because 'no one would take her seriously.'" *Id.* Dr. Khizanishvili continued that plaintiff brought with her "a few articles, including one about Chronic Fatigue Syndrome being associated with IBS and specifically being associated with a list of specific fecal bacteria" and that she "brought a stool sample with her too, just in case, given this." *Id.* However, Dr. Khizanishvili noted "normal" "labs/outside records" and characterized the "labwork [as] reassuring" such that "[n]o stool testing [was] recommended." *Id.*

On June 23, 2017, plaintiff was seen by Dr. Denise Armellini at The Endocrine Center. *Id.* at 903. The treatment notes state that plaintiff "self referred" herself there "for evaluation of chronic fatigue syndrome" after she "recently was found to have low aldosterone levels." *Id.* at

903. Dr. Armellini described plaintiff as "very pleasant." *Id.* Dr. Armellini recorded plaintiff's recitation of her medical history as follows:

> [Plaintiff] reports that symptoms started around last year, in March 2016 after she donated blood . . . . She reported that within 1 hour of donating blood, she los[t] consciousness. . . . Within 6–8 weeks after that, she continued to feel exhausted which persisted as she went to see a rheumatologist. She was diagnosed with fibromyalgia around June 2016. . . . She went to Florida and noticed something unusual. She came out of the swimming pool and she felt [lower extremity] heaviness and weakness. . . . She started getting symptoms of severe weakness, fatigue, nausea, auditory sensitivity . . . [and] severe pressure in her head. . . . She reports that fatigue has worsened. She reports that after she gets labs, she starts having symptoms similar to what she had before when she donated blood.

*Id.* Dr. Armellini diagnosed plaintiff as possibly suffering from dysautonomia and ordered a series of tests to assist her with reaching a firm conclusion, given that plaintiff "ha[d] been seen by many specialist[s] and ha[d] been diagnosed with many conditions, yet [remained] symptomatic." *Id.* at 905. The results from the comprehensive metabolic panel ordered by Dr. Armellini showed plaintiff's levels for glucose and electrolytes were "normal," and her cortisol levels were "very normal." *Id.* at 1240. The results also "rul[ed] out adrenal insuf[ficiency]," although plaintiff's aldosterone levels were "low." *Id.*

On July 11, 2017, Dr. Ackerman again examined plaintiff. *Id.* at 961. His notes from that encounter read: "She's convinced that she has autonomic dysfunction and is looking for further consultation. . . ." *Id.* To that end, plaintiff presented Dr. Ackerman with paperwork to complete so that plaintiff could participate in an autonomic dysfunction clinic at Vanderbilt University. *Id.* Plaintiff also informed Dr. Ackerman that she believed Dr. Haleem didn't take her seriously and Dr. Ackerman recorded that plaintiff did not "trust doctors at local hospitals to understand wh[at] she thinks is going on." *Id.* Dr. Ackerman assessed plaintiff with insomnia due to medical condition, malaise and fatigue, and orthostatic hypotension. *Id.* at 969.

In a July 12, 2017 Form SSA-3441, plaintiff stated that since December 31, 2016, her "fatigue ha[d] worsened and [her] overall health ha[d] deteriorated." *Id.* at 361. Specifically, plaintiff stated that she "began to suffer severe episodes" or "crashes" beginning in May of 2017, and that her crashes could last for up to two weeks. *Id.* Plaintiff attributed these crashes to "low blood volume and an electrolyte imbalance caused by . . . low aldosterone and elevated plasma renin levels" but noted "routine blood work did not show an electrolyte imbalance and no one tests blood volume or is even aware of the low blood volume phenomenon." *Id.* Indeed, it was not until after she "began to research" her "severe reaction" to giving blood that plaintiff "made the connection." *Id.*

Over the ensuing pages, plaintiff detailed her history of seeking and receiving medical treatment. *Id.* at 362–67. Of note, plaintiff described her June 6, 2017 appointment with Dr. Haleem that plaintiff scheduled because she "suspected [she] had adrenal insufficiency, specifically, low aldosterone." *Id.* at 365–66. Plaintiff stated that "Dr. Haleem very reluctantly ordered the blood work but only after a very heated and lengthy exchange and only at [plaintiff's] insistence." *Id.* Plaintiff continued that "Dr. Haleem left [her] a vmail message stating all [her] results were 'normal' [but plaintiff] knew this to be incorrect since [she] was able to obtain a copy of [her] results from the patient portal at Quest Diagnostics and the blood work confirmed that not only was [her] aldosterone level LOW but [her] plasma renin level was HIGH." *Id.* at 366. Plaintiff also stated Dr. Haleem refused to order other tests requested by plaintiff, and that plaintiff would "not be returning to" Dr. Haleem based on her experience during that visit. *Id.* Plaintiff elsewhere described "poor experience[s] with numerous doctors over the past year" such that she had "no confidence in the ability of emergency medical personnel to provide appropriate (life-saving) treatment if such treatment [wa]s needed." *Id.* at 369.

21

On July 20, 2017, Dr. Melissa Antonik examined plaintiff at Northern Virginia Endocrinologists, following a referral from Dr. Ackerman. *Id.* at 887. At that examination, plaintiff lay "flat on her back on the exam table, [as that wa]s more comfortable for her chronic abdominal discomfort." *Id.* at 890. Dr. Antonik noted that plaintiff had "suppressed aldosterone with an elevated renin" but reasoned that "[b]ecause aldosterone synthase deficiency is extremely rare and is usually picked up in childhood, the more likely explanation [wa]s high sodium intake (2 liters Pedialyte and V8 daily) and the renin raising effects of lisinopril" which plaintiff took every day. *Id.* at 887, 889.

On August 3, 2017, plaintiff was seen by Dr. Hasan Abdallah at Children's Heart Institute for "an evaluation of dysautonomia and Postural Orthostatic Tachycardic Syndrome." *Id.* at 1141. Dr. Abdallah obtained a comprehensive medical history from plaintiff and then performed a variety of tests, which showed that plaintiff's "heart rate increased from 59 BPM in the supine position to 78 BPM after standing 6 minutes" and noted plaintiff "experienced [a] headache" during this time. *Id.* at 1146. In response, Dr. Abdallah developed a plan to "optimize" plaintiff's medications to "achieve better systemic venous return." *Id.*

On August 30, 2017, plaintiff returned to Dr. Ackerman—essentially to inform him of her visit with Dr. Abdallah. *Id.* at 9793

On September 19, 2017, Dr. Abdallah reexamined plaintiff regarding her digestive issues, fatigue, poor sleep, vision issues, and tinnitus. *Id.* at 1134. He recorded a "very significant" Tilt Table test, which showed an increase in plaintiff's heart rate "from 71 beats per minute in the supine position to 91 beats per minute within 10 minutes of standing. . . . By 30 minutes of standing, she started experiencing symptoms of fatigue, blood p[o]oling, nausea, heaviness in legs/arms, and pain in legs." *Id.* at 1136.

22

On October 12, 2017, Dr. Tam Ly examined plaintiff at Fauquier Health Physician Services. *Id.* at 913. Dr. Ly reported that plaintiff "th[ought] she ha[d] low blood plasma volume" and had scheduled that visit "for evaluation of . . . elevated IgE and rule out of parasitic infections." *Id.* Dr. Ly, however, recorded a normal examination of plaintiff and attributed plaintiff's elevated eosinophil count as "likely related to her allergies . . . ." *Id.* at 913–17.

On October 14, 2017, plaintiff completed a new "Function Report." *Id.* at 375. Plaintiff's stated activities of daily life largely remained consistent with those that she reported on March 6, 2017. *Id.* at 374–84. However, plaintiff added that she regularly drank between seventy and eighty ounces of fluid by midday and had begun to need "help or reminders taking medicine" because she "easily" became "confused" "due to low blood volume." *Id.* at 375–77. Plaintiff also appended to her function report a single-spaced document that detailed plaintiff's understanding of her medical condition and its impact on her daily life. *Id.* at 383–84.

On October 17, 2017, plaintiff again visited Dr. Abdallah for treatment of her fatigue, insomnia, dizziness, and digestive issues. *Id.* at 1129. On examination, Dr. Adballah noted that plaintiff's heart rate increased "from 66 BPM in the supine position to 76 BPM after standing 10 minutes." *Id.* at 1132.

On November 3, 2017, plaintiff returned to Dr. Vasa and informed her that "she was accepted by Dr. Hasan Abdallah who is an autonomic specialist in Herndon, VA. He believe[d] [plaintiff] ha[d] hyperadrenergic POTS and ha[d] put her on mididrine . . . . However, she d[id] still have episodes of fatigue . . . [and] had pain in her hands and feet." *Id.* at 1320. Dr. Vasa further noted that "[Plaintiff] did try the Plaquenil [as previously prescribed by Dr. Vasa] for a few weeks" but stopped using it due to nausea. *Id.* Dr. Vasa concluded her notes by stating she performed no new tests during the visit. *Id.*

23

On November 30, 2017, the SSA rendered its decision on reconsideration—again finding that plaintiff was not disabled. *Id.* at 198–213. The Disability Adjudicator at that stage observed that "[p]hysical exams [we]re largely within normal limitations for [range of motion], strength and claimant ha[d] normal gait." *Id.* at 206. Based on the information before her, the Disability Adjudicator determined that plaintiff suffered from chronic fatigue syndrome, inflammatory arthritis, migraines, spine disorders, other diseases of her circulatory system, chronic kidney disease, and peripheral neuropathy. *Id.* at 207. The Disability Adjudicator continued that "[d]ue to [plaintiff's] impairments, chronic fatigue and orthostatic hypotension, . . . a light RFC" was appropriate. *Id.* at 206.

State agency doctors Andrew Bockner and Robert McGuffin assisted the Disability Adjudicator in reaching this decision. *Id.* at 207–13. Dr. Bockner identified "[n]o mental medically determinable impairments" were "established" in plaintiff's records. *Id.* at 207. Dr. McGuffin opined that plaintiff's stated symptoms were only partially consistent with the total medical and non-medical evidence on file because "some symptoms appear to be disproportionate to the severity and duration that would be expected, based on the claimant's medically determinable impairments." *Id.* at 208–09. Accordingly, Dr. McGuffin found that plaintiff could: occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; sit, stand, and/or walk for about six hours in an eight-hour workday; and had other exertional limitations due to chronic fatigue and joint pain. *Id.* at 209.

On January 9, 2018, Dr. Mohsen Ghafouri examined plaintiff after she informed him that she had "felt better since she ha[d] been on" the rheumatoid arthritis medication previously prescribed by Dr. Vasa. *Id.* at 1323.

24

On January 12, 2018, plaintiff completed a new Form SSA-3441. *Id.* at 387–97. In it, plaintiff stated that her CFS had gotten "worse when compared to this time last year" and described her daily experience in the same light. *Id.* at 388. Plaintiff also identified new medical providers who had begun treating her in the time since she submitted her original Form SSA-3441. *Id.* at 389–93.

On January 22, 2018, plaintiff was seen by Dr. Monfared "for her first visit in 1 year." *Id.* at 1335. There, plaintiff informed Dr. Monfared that she "had [a] viral infection in July 2017, which triggered a return of her symptoms" and that she "return[ed to Dr. Monfared] as her autonomic dysfunction may [have] be[en] a result of inflammation of the brain, and she d[id] not have a neurologist to see." *Id.* Dr. Monfared "advised [plaintiff to] go back on the migraine supplements" he previously had identified and/or prescribed for her and to stop taking other supplements she had begun ingesting. *Id.* at 1337. Plaintiff, in turn, informed Dr. Monfared that she would "follow up with a neurologist for evaluation of her autonomic dysfunction." *Id.*

On February 2, 2018, plaintiff returned to Dr. Ackerman and reported that she had not attended Vanderbilt University's autonomic clinic due to the pain she was in from mid-November through December. *Id.* at 983. Plaintiff further stated that she "continue[d] to deteriorate significantly and often w[ould] be out of commission for a few weeks" after getting blood drawn, and that her main symptoms continued to be "significant fatigue and malaise that limit[ed] her [activities of daily life.]" *Id.* In his plan, Dr. Ackerman noted that it had not been "proven definitely" that plaintiff's symptoms were linked to autonomic dysfunction and that she should continue to "work with Dr. Abdallah in th[at] regard" because "[f]rom an internal medicine standpoint unfortunately [there was] not a lot to offer at th[at] point." *Id.* at 992.

On February 22, 2018, plaintiff returned to Dr. Antonik. *Id.* at 1299. Dr. Antonik's notes from that visit read that plaintiff reported she had: "hyperadrenergic with POTS (HTN with standing), ME/CFC (myalgic encephalomyositis) with low circulating blood volume, mast cell activation disorder. She ha[d] chronic fatigue, dizziness, syncopal symptoms, diarrhea and abdominal pain. She [wa]s concerned about HPA dysfunction of patients with ME/CFC and w[ould] undergo adrenal stimulation testing for further evaluation."[8] *Id.* at 1301.

On March 14, 2018, plaintiff visited Dr. Maria Vera Nunez at Nova Southeastern University for "[m]usculoskeletal [p]ain, [w]eakness, [c]hronic fatigue and [o]utside medical records review." *Id.* at 1003. There, plaintiff recited her medical history and annotated Dr. Nunez's notes regarding the same. *Id.* at 1003–04. Dr. Nunez noted that plaintiff "endorse[d] the presence of 29 out of 54 symptoms" of CFS even though she "was not diagnosed with CFS by a physician and . . . d[id] not come with documentation of a CFS diagnosis from h[er] physician or health care provider." *Id.* at 1005, 1008. Dr. Nunez concluded her paperwork by outlining her diagnoses of plaintiff and her plan to treat and/or test for the same. *Id.* at 1011–12.

On March 26, 2018, plaintiff returned to Dr. Abdallah who treated her by modifying the prescribed medication regiment and ordering a CIBO test. *Id.* at 1560.

On April 9, 2018, plaintiff was seen by Dr. Seth Tuwiner at Virginia Center for Neuroscience. *Id.* at 1536. Dr. Tuwiner's records reflect that this was plaintiff's "first visit to the clinic" and that she "present[ed] with 'Myalgic encephalomyelitis.'" *Id.* On examination, Dr. Tuwiner noted that plaintiff's complaints of dizziness could be addressed through her "continue[d] care with her cardiologist for POTS" and that there was "no objective basis" for plaintiff's complaint of "Myalgias, unspecified" because "[h]er exam [wa]s normal." *Id.* at 1539. Dr. Tuwiner

---

[8] Dr. Antonik also examined plaintiff on October 22, 2018 and ordered diabetes testing "given [plaintiff's] history of impaired fasting glucose." *Id.* at 1559.

further commented that he would refer plaintiff for a sleep study and would "do a brain MRI to assess for demyelinating disease." *Id.* However, Dr. Tuwiner recorded that he "strongly opposed" plaintiff's "request[]" for a "Neuro-Quant" because he did "not feel th[at was] an accurate test for [plaintiff's] condition and ha[d] reservations about such testing in principle." *Id.*

On April 12, 2018, Dr. Abdallah authored a letter in which he identified plaintiff as suffering from "Mast-Cell Activation Disorder" and "Postural Orthostatic Tachycardia Syndrome (POTS), a form of Dysautonomia." *Id.* at 1149. Due to these diagnoses, Dr. Abdallah opined that plaintiff "might . . . not be able to focus and concentrate" and "may not be able to sustain sitting or standing for a long period of time" given that she "will not be able to maintain that posture without feeling dizzy, lightheaded, and may even faint." *Id.*

On April 24, 2018, plaintiff returned to Dr. Alpan, who maintained his diagnosis of chronic fatigue and immune disorder. *Id.* at 1405–06. Dr. Alpan's plan of care required plaintiff to continue her medication regiment and called for ongoing monitoring of plaintiff's immune system. *Id.* at 1406. Six days later, Dr. Alpan relayed to plaintiff that all of the related "lab results and [a] musk antibody test" were "all finalized [and] normal." *Id.* at 1408. Plaintiff responded less than an hour later questioning those results—specifically whether "*all 5 MuSK receptors, M1 through M5, were tested as part of the Anit-MuSK Antibody test*." *Id.* Dr. Alpan's office responded that Dr. Alpan "didn't have the answer to the questions" plaintiff raised and that "he would like [plaintiff] to see a neurologist." *Id.* at 1410. Plaintiff, in turn, responded that she "ha[d] someone else looking into the MuSK Antibody Test Quest performed since, subsequent to having that test done, [she] was told by [her] ME CFS specialist, Dr. Vera, that the Quest Anti-MuSK Antibody test simply isn't sensitive enough or reliable enough to perform the definitive blood antibody test for the muscarinic form of MG." *Id.* at 1409. Regarding Dr. Alpan's plan to refer plaintiff to a neurologist, plaintiff

27

responded: "I need a neurologist that [specializes in MG,] especially if I have this rare form of MG or another rare autoimmune or neurological disease that affects the autonomic nervous system." *Id.*

On June 8, 2018, plaintiff established new primary care with Dr. Vipul Parikh at Mountain View Internal Medicine and Pediatrics. *Id.* at 1689. Plaintiff explained that she had left Dr. Ackerman's practice because she found him to be "'dismissive' over her symptoms." *Id.* Plaintiff also stated she had "seen other doctors in recent months who all t[ook] her seriously at first but then bec[a]me less interested when labs [we]re unremarkable." *Id.* Dr. Parikh noted that plaintiff was "[i]nvestigating potential other medical diseases which might be underlying causes to [her] dysautonomia" and that plaintiff also was "exploring possibilities of early Sjogrens or myasthenia gravis." *Id.* at 1690. Dr. Parikh recorded that he responded by saying he "would be happy to support in any way possible facilitating testing but that [he] would have limitations on interpreting some of the more uncommon tests and would need specialist help for th[at]." *Id.*

On June 18, 2018, plaintiff self-referred herself to Dr. Ricardo Roda, Assistant Professor, Neurology Department at Johns Hopkins University. *Id.* at 1216. Dr. Roda agreed to order some diagnostic testing but noted that plaintiff's "neurological exam [wa]s normal." *Id.* at 1220.

On June 25, 2018, plaintiff reported to Innova Medical Group Neurology, where Dr. Ramsey Falconer examined her. *Id.* at 1222. Dr. Falconer noted that plaintiff's "history [wa]s very detailed but the symptoms at play [we]re nonspecific, and revolve[d] around intense episodes of fatigue, brain fog, anxiety and short term memory loss." *Id.* at 1223. However, "[t]he workup thus far d[id] not reveal a cause." *Id.* Specifically, Dr. Falconer opined that plaintiff did "not have POTS or the hyper-POTS she describe[d], as even the testing completed by the POTS specialist d[id] not show a tachycardic response nor an orthostatic BP change. [Plaintiff] also d[id] not describe other

persistent and consistent autonomic abnormalities, so by definition d[id] not have POTS nor any of its derivatives." *Id.* at 1224. Dr. Falconer stated this conclusion was "without doubt." *Id.*

Dr. Falconer continued that he was "worried that [plaintiffs'] workup, self-research and multiple specialists['] input ha[d] lead [*sic*] her down a road of either extremely rare symptoms or the idea of her being the index patient of a new disorder, both of which are unlikely given her symptomology as a whole." *Id.*  Rather, Dr. Falconer believed "that the symptoms that occurred around [plaintiff's] viral illness were in fact simply sequal[a] of a viral illness, and the continued fatigue, brain fog, anxiety, et al [we]re more likely a product of a primary sleep disorder." *Id.*  Dr. Falconer supported this diagnosis by stating that all of plaintiff's symptoms "fit with a diagnosis of chronic sleep deprivation, including short term memory loss" and that plaintiff's description of "waking gasping at night at times and snoring" suggested "undiagnosed sleep apnea," which also could be a cause. *Id.* Accordingly, Dr. Falconer "order[ed] a sleep study" but "would not recommend further blood work given [plaintiff's] response to blood draws, which [he could ]not explain." *Id.* Dr. Falconer stated he believed there was "nothing in medicine or neurology which would result in a week of debilitation from a single blood draw, so the consideration for a primary psychiatric disorder/functional nonphysical disorder must also be considered." *Id.*

On July 11, 2018, plaintiff visited Dr. Parikh—reporting that she was "down for days" during the "last week." *Id.* at 1686. Dr. Parikh also noted that plaintiff stated she "[w]ould like to have tests screening for other autoimmune processes such as lupus anticoagulant, myasthenia gravis" and that Dr. Parikh stated he would "order [those tests] though [he] warned [he was] not as familiar with some of the requested tests and interpretation [would] be difficult for [him]." *Id.* at 1687.

29

On July 16, 2018, plaintiff returned to Dr. Abdallah, stating her symptoms of fatigue, brain fog, shallow breathing, and gastrointestinal issues had worsened since he last had seen her. *Id.* at 1354. Upon examination, Dr. Abdallah noted that "[d]espite being on multiple medications, [plaintiff] [wa]s still struggling with [her] Postural Orthostatic Tachycardic Syndrome." *Id.* at 1358.

On August 2, 2018, plaintiff asked Dr. Parikh to re-write the test order provided by Dr. Roda so that it could "broken down into several tests because she ha[d] low blood volume." *Id.* at 1684. Dr. Parikh obliged. *Id.*

On August 23, 2018, plaintiff provided Administrative Law Judge Mark A. O'Hara with the following documents: (1) a four-page, single-spaced narrative description of plaintiff's work history; (2) a handwritten form listing plaintiff's then-current medications; (3) a five-page, single-spaced narrative document through which plaintiff explained her recent medical treatment, commented on that treatment's quality, and inserted her own understanding of what was needed to treat her condition and her statements to doctors regarding the same; (4) a single-spaced cover letter to ALJ O'Hara educating him on ME/CFS; and (5) a five-page, single-spaced paper by plaintiff, titled "What I Discovered about ME CFS." *Id.* at 414–31; *see also id.* at 444–59.

On September 4, 2018, Dr. Abdallah completed a "Residual Functional Capacity Form." *Id.* at 1412. In it, Dr. Abdallah stated that plaintiff's impairment prevented her from standing for more than "short periods of time" and that plaintiff would be unable to sit for more than "1–2 hours at a time." *Id.* at 1413. In addition, Dr. Abdallah opined that plaintiff would need to "lie down during the day" due to her impairments, "frequently" could perform various reaching movements, and could lift and carry between five and ten pounds in a regular day. *Id.* at 1414. Dr. Abdallah continued that he found plaintiff credible, that there was no objective medical reason for plaintiff's

pain, and that plaintiff could resume work "at current or previous employment" only "as long as accommodations to [plaintiff's] conditions [we]re regulated." *Id.* at 1416.

On October 5, 2018, plaintiff was "evaluated for myasthenia gravis" by Dr. Vinay Chaudry at Johns Hopkins University. *Id.* at 1421. The results from a single fiber EMG were "normal" and plaintiff was found not to have myasthenia gravis. *Id.* at 1421, 1437. Dr. Roda informed plaintiff of this conclusion over the telephone. *Id.* at 1437.

On October 9, 2018, plaintiff again visited Dr. Parikh and reported she "[t]akes care of pony in morning. Runs errands, eats lunch and then has to rest. Gives her energy to take care of pony in evening." *Id.* at 1681.

On February 25, 2019, plaintiff returned to Dr. Parikh—reporting that she was "pretty much bedridden" for most of the preceding six-to-eight weeks. *Id.* at 1677. In his notes, Dr. Parikh wrote that plaintiff was "always eager to have tests screening for other autoimmune processes such as lupus anticoagulant, myasthenia gravis, Sjogrens. So far have not been positive." *Id.*

On June 10, 2019, after her hearing date but before receiving a written opinion, plaintiff wrote to ALJ Knight to present additional "information which just recently [had] bec[o]me available to [her]." *Id.* at 461. To wit, plaintiff informed ALJ Knight that she recently completed "one of the most complicated and technologically advanced" forms of "genetic testing" and that the results revealed plaintiff had "not only . . . one rare pathogenic (disease causing) genetic variant but four . . . ." *Id.*

On June 25, 2019, the ALJ issued her opinion. *Id.* at 28. Sometime thereafter, plaintiff submitted a three-page, single-spaced document titled "Reasons for Appealing Decision" and attached a separate five-page, single-spaced exhibit titled "How ME CFS Has Changed My Life."

31

*Id.* at 467–75. Plaintiff also separately submitted an undated challenge to ALJ Knight's opinion, which spanned ten single-spaced pages. *Id.* at 476–85.

## II.   Disability Evaluation Process

The Social Security Regulations define "disability" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). To meet this definition, the claimant must have a severe impairment that makes it impossible to do past relevant work or any other substantial gainful activity ("SGA") that exists in the national economy. *Id.*; *see also Heckler v. Campbell*, 461 U.S. 458, 460 (1983).  Determining whether an applicant is eligible for disability benefits under the SSA entails a "five-part inquiry" that "asks: whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a medical impairment (or combination of impairments) that are severe; (3) the claimant's medical impairment meets or exceeds the severity of one of the impairments listed in [the SSA's official Listing of Impairments]; (4) the claimant can perform her past relevant work; and (5) the claimant can perform other specified types of work." *Hines v. Barnhart*, 453 F.3d 559, 562 (4th Cir. 2006). Before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"), meaning the most that the claimant can do despite her physical or mental limitations. 20 C.F.R. §§ 416.920(h), 416.945(a)(1).

### A.   The ALJ's Decision

On June 25, 2019, the ALJ issued a decision finding plaintiff not disabled from July 21, 2016 through the date of her decision. AR at 50. Under the first step of her five-part inquiry, the

ALJ found that plaintiff had not engaged in any substantial gainful activity since July 21, 2016. *Id.* at 33.

At step two, the ALJ found that plaintiff had the following severe impairments: chronic fatigue syndrome, post viral syndrome, postural orthostatic tachycardia syndrome, rheumatoid arthritis, and obesity. *Id.* at 34. In addition, the ALJ noted the following non-severe impairments that plaintiff suffered from: hypertension, hyperlipidemia, interstitial cystitis, chronic kidney disease, hypothyroidism, tinnitus, vestibular migraines, irritable bowel syndrome, facet arthropathy, foraminal stenosis, Schmori's node, and cervical disc herniation and spondylosis. *Id.*

Under step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the SSA's official Listing of Impairments. *Id.* at 36. The ALJ considered listings 1.02 (major dysfunction of joints), 1.04 (disorders of the spine), 2.07 (disturbance of labyrinthine-vestibular functions), 4.02 (chronic heart failure), 4.05 (arrhythmias), and 11.00 (neurological disorders), 11.14 (peripheral neuropathy), 11.17 (neurodegenerative disorders of the central nervous system), 12.00 (mental disorders), 14.06 (undifferentiated and mixed connective tissue disease), 14.09 (inflammatory arthritis), and 14.10 (Sjögren's syndrome) but found that plaintiff satisfied none—even when accounting for plaintiff's obesity. *Id.* at 36–38.

Before proceeding to steps four and five, the ALJ determined plaintiff's RFC. In doing so, the ALJ considered all reported symptoms and the extent to which they were reasonably consistent with objective medical evidence and opinion evidence. *Id.* at 38. The ALJ applied a two-step process, considering first whether plaintiff's underlying impairments would be reasonably expected to produce plaintiff's symptoms, and second whether those impairments limit plaintiff's functioning. *Id.* at 38–39. The ALJ determined that, although plaintiff's impairments could be

33

reasonably expected to cause plaintiff's symptoms, plaintiff's statements about the intensity, persistence, and limiting effects of the symptoms were "not entirely consistent with the medical evidence and other evidence" in the record. *Id.* at 39–40.

The ALJ then concluded that plaintiff had the RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b), except that she could: (1) only occasionally (i) climb ramps and stairs, (ii) balance stoop, kneel, crouch, or crawl, or (iii) be exposed to extreme cold or extreme heat; and (2) never (i) climb ladders ropes, or scaffolds, or (ii) work at unprotected heights or around moving mechanical parts. *Id.* at 38. In addition, the ALJ determined plaintiff could tolerate a work environment with only a moderate noise level and would need to be "off task" for five percent of the time in an eight-hour workday, in addition to normal breaks. *Id.*

In support, the ALJ provided a detailed overview of plaintiff's physical health records. *Id.* at 39–45. The ALJ at this point focused specifically on plaintiff's history of self-referrals to specialists despite "noted control [of her fatigue] and [her] routinely unremarkable examinations." *Id.* at 44 ("The neurologist also expressed concern that the claimant's workup, self-research, and multiple specialists . . . led her astray."); *see also id.* ("Her primary care provider noted that the claimant is 'always eager to have tests screening for other autoimmune processes' but so far none have been positive."), *id.* at 45 ("providers have noted at times that there is no objective evidence related to [plaintiff's] symptoms").

The ALJ also found plaintiff's medical history reflected "conservative" treatment "consisting primarily of oral medications and supplements." *Id.* at 45. The ALJ then used that observation, coupled with the fact that "[c]linicians have not indicated that [plaintiff] requires more aggressive care to help manage her symptoms," to support her conclusion that the functional limitations caused by plaintiff's "chronic fatigue syndrome, post viral syndrome, postural

orthostatic tachycardia syndrome, and rheumatoid arthritis" were "not as severe or as limiting as [plaintiff] claim[ed]." *Id.*

With respect to opinion evidence, the ALJ gave "significant, but not great, weight" to the opinions of two state agency reviewing physicians: Drs. Godwin and McGuffin. *Id.* at 46–47. Conversely, the ALJ gave "little weight" to the opinions offered by two of plaintiff's treating physicians—Drs. Ackerman and Abdallah—because neither opinion was "consistent with the medical evidence" or plaintiff's reports regarding her daily activities. *Id.* at 47–48.

Under step four, the ALJ found plaintiff could perform "past relevant work as a contract administrator and a telecom manager" because that work did "not require the performance of work-related activities precluded by [plaintiff's] functional capacity." *Id.* at 48. Accordingly, and in light of plaintiff's age, education, work experience, and RFC, the ALJ found plaintiff was not disabled and that there were jobs that existed in significant numbers in the national economy that the plaintiff could perform. *Id.* at 50.

### B.    Appeals Council Review

The Appeals Council denied plaintiff's request for review, finding no basis for review, and held the ALJ's decision to be the final decision of the Commissioner of Social Security. *Id.* at 1.

## III.   Standard of Review

In reviewing a decision of the Commissioner, district courts are limited to determining whether the Commissioner's decision was supported by substantial evidence in the record, and whether the proper legal standard was applied in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see*

*also Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws*, 368 F.2d at 589. When evaluating whether the Commissioner's decision is supported by substantial evidence, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Secretary." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1996). "Ultimately, it is the duty of the [ALJ] reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." *Id.* (citing *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)).  If supported by substantial evidence, the Commissioner's findings as to any fact are conclusive and must be affirmed. *See* 42 U.S.C. § 405(g); *see also Richardson*, 402 U.S. at 401.

Although the standard is high, when the ALJ's determination is not supported by substantial evidence or when the ALJ has made an error of law, the district court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). In evaluating whether the ALJ made an error of law, the Fourth Circuit applies a harmless error analysis in the context of social security disability determinations. *See Mascio v. Colvin*, 780 F.3d 632, 639 (4th Cir. 2015). The harmless error doctrine prevents remand when the ALJ's decision is "overwhelmingly supported by the record though the agency's original opinion failed to marshal that support" and a remand would be "a waste of time." *Williams v. Berryhill*, Case No. 1:17-cv-167, 2018 WL 851259, at *8 (E.D. Va. Jan. 18, 2018) (citing *Bishop v. Comm'r of Soc. Sec.*, 583 Fed. App'x 65, 67 (4th Cir. 2014) (per curium)). An ALJ's error may be deemed harmless when a court can conclude on the basis of the ALJ's entire opinion that the error did not substantively prejudice the claimant. *See Lee v. Colvin*, Case No. 2:16-cv-61, 2016 WL 7404722, at *8 (E.D. Va. Nov. 29, 2016). When reviewing a decision for harmless error, a court must look at "[a]n estimation of the likelihood that

36

the result would have been different." *Morton-Thompson v. Colvin*, Case No. 3:14-cv-179, 2015 WL 5561210, at \*7 (E.D. Va. Aug. 19, 2015) (citing *Shineski v. Sanders*, 556 U.S. 396, 411–12 (2009)).

## IV.   Analysis

Plaintiff moves for summary judgment based on five alleged errors with the ALJ's opinion, namely that the ALJ: (1) improperly weighed the medical opinions in the record; (2) unjustifiably discounted the testimony offered by plaintiff and her husband; (3) failed to consider *all* of the objective medical evidence in the record; (4) incorrectly applied SSR 96-8p and SSR 96-9p in determining plaintiff's RFC;[9] and (5) did not apply SSR 14-1P (*i.e.*, properly consider plaintiff's CFS) when doing the same. *See* Pl. Br. (Dkt. No. 16) at 7–31. Defendant responds that no such errors occurred. Def. Br. (Dkt. No. 18) at 16–30.

For the reasons that follow, the Court agrees with defendant. Plaintiff's motion for summary judgment will be denied, defendant's motion for summary judgment will be granted, and the ALJ's decision will be affirmed.

### A.   The ALJ's Analysis of Medical Opinions

When determining a claimant's Social Security disability status, the ALJ is required to consider and weigh the medical opinions of all physicians on the record. *See* 20 C.F.R. § 404.1527(b). If the medical opinion is of the claimant's "treating physician," the opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).[10] If the opinion is not entitled to controlling weight, the ALJ

---

[9] SSRs are a series of precedential decisions relating to the programs administered by SSA and are published under the authority of the Commissioner of Social Security. *See* Social Security Ruling Definition, available at https://www.ssa.gov/regulations/def-ssr.htm.

[10] This standard and the related regulations apply to claims for disability filed before March 27, 2017. The SSA has

must consider six factors in determining how to weigh the opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination"; (2) the "[n]ature and extent of the treatment relationship"; (3) the extent to which the treating physician "presents relevant evidence to support [the] medical opinion"; (4) the extent to which the opinion is consistent with the evidence in the record; (5) the extent to which the treating physician is opining as to "issues related to his or her area of specialty"; and (6) any other factors "which tend to support or contradict the medical opinion." 20 C.F.R. § 404.1527(c)(2)(i)–(6). The ALJ is not required to detail every factor in his or her decision; however, the record must reflect that the ALJ *considered* each factor in determining how much weight to give an opinion. *See Dowling v. Comm'r of Soc. Sec. Admin.*, 986 F.3d 377, 385 (4th Cir. 2021) (finding the ALJ's decision was "bereft of any reference to the factors as a whole," and that "[t]he ALJ never so much as hinted that his discretion was checked by the factors" in the regulation).

Plaintiff argues that the ALJ did not abide by this standard when she "failed to present good cause as to why" the treating source opinions of Drs. Ackerman and Abdallah deserved little weight. Pl. Br. at 8. In addition, plaintiff faults the ALJ for considering only those two doctors' opinions and not the opinion of another treating physician—namely, that of Dr. Maria Vera Nunez (who plaintiff identifies as "one of only a handful of ME CFS specialists in this county"). *Id.*

At the same time, plaintiff challenges the ALJ for giving significant, but not great, weight to the opinions of Drs. Godwin and McGuffin who plaintiff claims were not "familiar with or considered experts in diagnosing and treating ME CFS, POTS, or MCAS"[11] which are "highly complex, widely unknown, and poorly understood" medical conditions. *Id.* at 9.

---

promulgated different rules for claims filed on or after March 27, 2017. *See* 20 C.F.R. § 404.1520c. Because plaintiff filed for disability on December 29, 2016, her claims are not subject to the new rules.

[11] Mast Cell Activation Syndrome.

Defendant responds that the ALJ properly weighed the medical opinion evidence on record because "the ALJ used the relevant regulatory factors to explain the weight she afforded to the medical opinions, and substantial evidence supports the ALJ's analysis." Def. Br. at 16. For the following reasons, the Court agrees with defendant and finds no basis to disturb the ALJ's treatment of the recorded medical opinions.

*Dr. Ackerman:* The ALJ awarded "little weight" to Dr. Ackerman's opinion because although Dr. Ackerman was one of plaintiff's "primary care providers" who "treated [plaintiff] many times,"[12] the ALJ found his opinion was "not entirely consistent with the medical evidence" in the administrative record or with later reports from plaintiff that she could "drive, prepare meals, do light household chores, and care for her pony daily, which are all activities requiring her to exert herself in a number of ways, suggesting she can perform a variety of tasks despite her fatigue." AR at 47. Similarly, the ALJ found Dr. Ackerman's opinion that plaintiff was "limited in multiple ways during the day due to her fatigue and dizziness," *id.* at 982, not well-supported by "medically acceptable clinical and laboratory diagnostic techniques," 20 C.F.R. § 404.1527(c)(2), because "Dr. Ackerman, rarely described [plaintiff] as appearing fatigued or having deficiencies in her attention and concentration during medical appointments." AR at 47. Indeed, Dr. Ackerman's opinion reads that "[o]n physical exam [he] found no objective evidence of abnormality. The only objective evidence found was the positive serologic titers pertaining to the Parvovirus and Epstein Barr virus." *Id.* at 982.

The ALJ also observed that Dr. Ackerman's opinion (1) addressed plaintiff's "functioning during a short, month-long period" in late 2016; and (2) encroached on "an administrative conclusion that is reserved to the Commissioner." *Id.* at 47 (citing 20 CFR 404.1527(e)). Put

---

[12] Although this is an accurate observation, the Court notes that Dr. Ackerman had seen plaintiff only two times prior to October 3, 2016—the date of his opinion. *See* AR at 564, 573, 982.

together, all of these observations satisfy the Court that the ALJ identified substantial evidence supporting her conclusion that Dr. Ackerman's opinion was not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and was "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The Court also notes that plaintiff, herself, ceased seeking treatment from Dr. Ackerman over his later "dismissive[ness]" regarding her symptoms. AR at 1689. The Court, thus, finds no legal error in the weight the ALJ assigned to Dr. Ackerman's October 2016 opinion.

*Dr. Abdallah:* The ALJ similarly gave "limited weight" to Dr. Abdallah's opinion because of its "inconsistencies" with the total record and "lack of support for the restrictions [it] describe[d]." AR at 48. The ALJ acknowledged that as plaintiff's cardiologist, Dr. Abdallah had "treated [plaintiff] multiple times." *Id.* But the ALJ still found Dr. Abdallah's "opinions [we]re not consistent with the medical evidence, which show[ed plaintiff wa]s not as limited in her abilities to sit, stand, walk, lift, carry, and concentrate as" Dr. Abdallah had opined. *Id.* at 47–48. Specifically, the ALJ reasoned that Dr. Abdallah's opinion was inconsistent with the record evidence showing that medical "providers rarely observed [plaintiff] to appear uncomfortable sitting or standing during appointments[,]"—which often lasted more than an hour—"nor did they describe irregularities in her gait and station or significant edema in her lower extremities." *Id.* In addition, the ALJ found ample evidence in the record that plaintiff could perform activities of daily life otherwise foreclosed by Dr. Abdallah's opinion because plaintiff elsewhere stated she could "car[e] for her pony, driv[e], and prepar[e] meals" and also could "run errands . . . alone." *Id.* The ALJ found Dr. Abdallah's conclusion to the contrary not only inconsistent with such statements, but also unsupported by objective medical evidence. *Id.* at 48.

As with the above analysis, the ALJ properly considered the applicable regulatory factors when deciding how much weight to give Dr. Abdallah's opinion and the ALJ identified substantial evidence in the record that supported her application of those factors. Accordingly, the Court identifies no reversible error associated with the ALJ's treatment of Dr. Abdallah's opinion.

*Dr. Nunez:* In her decision, the ALJ recounted the "functional medical evaluation" that Dr. Nunez performed in March 2018. *Id.* at 43. The ALJ did not, however, interpret the related medical records as containing a "medical opinion" and, thus, did not assign any "weight" to Dr. Nunez's notes. The Court finds that the ALJ did not err in so doing.

Medical opinions are "statements from acceptable medical sources that reflect *judgments* about the nature and severity of a claimant's impairment(s), including the claimant's symptoms, diagnosis, and prognosis, what the claimant can still do despite impairment(s), and the claimant's physical or mental restrictions." *Britt v. Saul*, 860 F. App'x 256, 260 (4th Cir. 2021) (quoting 20 CFR §§ 404.1527(a)(1), 414.927(a)(1)) (cleaned up; emphasis in original).

The question before the Court is whether the ALJ erred in finding that Dr. Nunez did not provide an "opinion" regarding plaintiff's alleged disability. If Dr. Nunez's records do contain an opinion, it needed to be assigned some form of persuasive weight. *See id.* (citing 20 CFR §§ 404.1527(c), 416.927(c)). But if Dr. Nunez did not provide an opinion, the ALJ was required to undertake no such evaluation. *See id.* at 261 ("The agency must consider the entire record, but is only *required* to attribute weight to medical opinions in the record.") (emphasis in original).

After reviewing the records generated from plaintiff's March 14, 2018 visit to Dr. Nunez, the Court concludes that Dr. Nunez did not offer a medical opinion because the documents associated with that visit contain no judgments from Dr. Nunez regarding plaintiff's "physical or mental restrictions" or what she "still can do" despite her impairments. *See Britt*, 860 F. App'x at

260. The only information contained in Dr. Nunez's records that touched on those topics was her recitation of plaintiff's subjective complaints regarding the same. But those notes include no judgment on the part of Dr. Nunez regarding plaintiff's functional capacity. Instead, they merely document the complaints relayed to her by plaintiff. *See, e.g.*, AR at 1006 ("Patient refers to her activity status as: 50% Patient's energy only allows her to do about 3 tasks per day (2–3 hours of activity)"). As such, the Court finds that Dr. Nunez did not provide a medical opinion and that plaintiff's claims regarding the "considerable weight" owed to Dr. Nunez's "opinion," therefore, are without merit.

*Drs. Godwin and McGuffin:* The ALJ afforded "significant, but not great, weight" to the May and November 2017 opinions of state agency reviewing physicians Godwin and McGuffin. *Id.* at 46. The ALJ assigned such weight even though neither doctor examined plaintiff. In justifying this treatment, the ALJ first observed that both doctors "review[ed] the medical evidence" and then concluded that "their opinions [we]re largely consistent with that evidence." *Id.* at 46. In support, the ALJ cited thirty-seven entries in the administrative record that she believed were consistent with the opinions of Drs. Godwin and McGuffin that plaintiff could "perform a reduced range of light work." *Id.* at 47. For example, the ALJ noted that "[w]hile orthostatic testing has shown some increase in [plaintiff's] heart-rate while standing the fluctuations were often minimal and improved as she stood for longer periods." *Id.* The ALJ interpreted that medical evidence to "suggest[] that [plaintiff] should be able to stand and walk as noted by Dr. Godwin and Dr. McGuffin." *Id.*

The ALJ, however, did not accept either doctor's opinion wholesale. Instead, she found that plaintiff's medical records "also show[ed] plaintiff ha[d] additional restrictions [that Drs. Godwin and McGuffin] fail[ed] to assess." *Id.*

On this record, the Court cannot find that the ALJ failed to support her assessment of those doctors' opinions with substantial evidence. And plaintiff's arguments that neither doctor specialized in treating her disorders and the exception she takes to Dr. Godwin's observation that "clinician[s] typically do not indicate [plaintiff] appears uncomfortable standing or walking during appointments," Pl. Br. at 9, does not alter that conclusion.

Indeed, the "ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up 'specious inconsistencies' or has not given good reason for the weight afforded a particular opinion." *Koonce v. Apfel*, 166 F.3d 1209 (Table), 1999 WL 7864, at *2 (4th Cir. 1999); *see also Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2021) (the Court "must defer to the ALJ's assignment of weight [to medical opinions] unless they are not supported by substantial evidence"). For the reasons stated, the Court finds that the ALJ supported the persuasive weight she assigned each medical opinion with substantial evidence, within the regulatory framework, and without manufacturing "specious inconsistencies" in the medical record.[13]

### B.      The ALJ's Evaluation of Plaintiff's Subjective Complaints

Plaintiff's second basis for appeal is that "[t]he ALJ erred in finding that [p]laintiff's symptom testimony and her reports of her limitations were somehow 'not as problematic as she allege[d.]'" Pl. Br. at 15. Defendant responds: "Not so." Def. Br. at 21. For the reasons that follow, the Court identifies no reversible error on this point.

---

[13] The Court also notes that although plaintiff faults the ALJ for not ordering the consultative examination apparently considered by "the ALJ's predecessor, Judge Mark A. O'Hara," *see* Pl. Br. at 11, the law is clear that such a decision rested entirely within the discretion of the ALJ and the Court will not disturb that decision on appeal. *See Cooke v. Berryhill*, 767 F. App'x 539, 540 (4th Cir. 2019) (citing *Sims v. Apfel*, 224 F.3d 380, 381–82 (5th Cir. 2000) ("whether to order a consultative examination lies within the ALJ's discretion")); 20 CFR § 404.1519a ("If we cannot get the information we need from your medical sources, we *may* decide to purchase a consultative examination . . . . We *may* purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination on your claim.") (emphases added).

When evaluating a plaintiff's subjective complaints of pain in the context of a residual functional capacity determination, the ALJ must follow a two-step analysis. *See William M. v. Kijakazi*, Case No. 3:20-cv-377, 2021 WL 4078971, at *5 (E.D. Va. Sept. 8, 2021) (citing 20 CFR §§ 404.1529(a), 416.929(a)); *Craig*, 76 F.3d at 594. The first step of the analysis requires the ALJ to determine the existence of an underlying medically determinable physical or mental impairment or impairments that could reasonably produce the plaintiff's alleged pain or other symptoms. *Id.* (citing 20 CFR §§ 404.1529(b), 416.929(b); *Craig*, 76 F.3d at 594). That threshold determination requires a showing, by objective evidence, "'of the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the [plaintiff].'" *Id.* (quoting *Craig*, 76 F.3d at 594). Only after making such a determination may the ALJ proceed to the second step and evaluate the intensity and persistence of plaintiff's symptoms to determine the extent to which they limit her ability to work. *Id.* (citing *Craig*, 76 F.3d at 595).

If she proceeds to the second step, the ALJ determines the extent to which the pain impairs the plaintiff's ability to work, which requires the ALJ to consider objective medical evidence and other objective evidence, as well as the plaintiff's allegations. *Id.* (citing *Craig*, 76 F.3d at 595). "'Although a [plaintiff]'s allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the [plaintiff] alleges she suffers.'" *Id.* (quoting *Craig*, 76 F.3d at 595).

In considering plaintiff's subjective complaints, the ALJ must consider "'all of the available evidence,'" *id.* (quoting 20 CFR §§ 404.1529(a); 416.929(a)), including "'statements from the individual, medical sources, and any other sources that might have information about the

individual's symptoms . . . as well as the factors set forth in [the] regulations.'" *Id.* (quoting SSR 16-3p, 2016 WL 1119029, at *5 (Mar. 16, 2016)); *see also* 20 CFR § 404.1529(c) (listing factors to consider, such as activities of daily living; the location, duration, frequency, and intensity of pain or other symptoms; any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms).

When the ALJ follows this framework, her "specific credibility determinations should be afforded great weight especially when, as is found here, the ALJ had the opportunity to observe plaintiff at a hearing and plaintiff's alleged disability rests almost exclusively on her subjective complaints . . . ." *Soghoian v. Colvin*, Case No. 1:12-cv-1232-LO, 2014 WL 996530, at *11 (E.D. Va. Mar. 13, 2014) (citing *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003) and *Shively v. Heckler*, 739 F.2d 987 (4th Cir. 1984)); *see also Carpenter v. Berryhill*, Case No. 3:17-cv-248, 2018 WL 3385191, at *12 (E.D. Va. May 31, 2018) ("[w]hen the ALJ appropriately considers all relevant factors, hears the claimant's testimony and observes [her] demeanor, the ALJ's credibility determination deserves [] deference").

Here, the Court finds that the ALJ properly followed both steps in her analysis when considering plaintiff's "state[ments] that her pain and fatigue prevent her from working because she cannot sit, stand, or walk for very long, cannot lift any weight repetitively, must rest frequently throughout the day, and struggles to perform even routine daily tasks." AR at 45.

*First*, the ALJ determined that plaintiff suffered from significant underlying medically determinable physical impairments that could reasonably produce her alleged pain or other symptoms. *Id.* at 39 ("[a]fter careful consideration of the evidence, the undersigned finds that the

claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms").

*Second*, the ALJ determined that plaintiff's subjective "statements concerning the intensity, persistence and limiting effects of these symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record." *Id.* at 40. In reaching that conclusion, the ALJ commented that "providers have noted at times that there is no objective evidence related to [plaintiff's] symptoms" and that even where no such comments explicitly arose, "[t]he objective evidence" still did "not fully support [plaintiff's] statement[s]." *Id.* at 45. The ALJ noted, for example, that plaintiff's physical examination records "fail[ed] to display any strength, sensation, gait, coordination, or range of motion abnormalities." *Id.* For example, the ALJ recognized that "rheumatoid arthritis is a condition that waxes and wanes" but observed that "even when [plaintiff] has complained of an increase in pain and other symptoms [attributable to her rheumatoid arthritis], clinicians have not noted a corresponding increase in tenderness or fatigue in examination." *Id.* The ALJ supported that observation with citations to thirty-four separate entries in the administrative record. *Id.*

The ALJ similarly noted plaintiff had "indicated that, because of her symptoms, she is forgetful, cannot sustain attention for very long, has trouble following instructions, and does not deal well with stress or changes in her routine" but found "examinations typically fail[ed] to reveal any abnormalities in the claimant's mental status, even during periods of increased stress." *Id.* The ALJ further observed that after plaintiff's alleged onset date, she still had shown the ability to "manage her own medical care, provide detailed information about her medical history and functioning, [and] write papers about her medical conditions." *Id.* The ALJ supported those statements with citations to thirty-eight entries in the administrative record. *Id.* The Court adds to

the ALJ's observations on that point that plaintiff's filings in this matter (which regularly have exceeded forty pages in length) provide further support for the ALJ's opinion insofar as those papers have been timely, sophisticated, and complete.

Finally, the ALJ referenced plaintiff's activities of daily life as additional evidence that plaintiff's "symptoms [we]re not as severe or as limiting as she claim[ed]."[14] And it is here that plaintiff primarily takes issue—arguing that although plaintiff's function reports "listed several activities she might do in a day[, t]he ALJ failed to acknowledge that, over and over in the same report, [p]laintiff explained that she could complete only some of the tasks in a single day . . . including only being able to shower 2–3 times a week, . . . driv[e] short distances, [and] run[] errands . . . only occasionally." Pl. Br. at 15.

Plaintiff is correct that "[a]n ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them." *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (emphasis in original). But the ALJ did not run afoul of that rule when she explicitly noted that plaintiff only could "drive *short* distances and, *at times*, run errands." AR at 45 (emphases added). Moreover, and as stated, the ALJ identified other substantial evidence in the record to support her conclusion regarding plaintiff's credibility, irrespective of the ALJ's observations regarding plaintiff's ability to engage in activities of daily life. Accordingly, the Court finds no basis to disturb the ALJ's well-reasoned explanation for her credibility determination.

---

[14] The ALJ also recognized that plaintiff's husband provided testimony regarding plaintiff's limitations that "largely echoe[d] that provided by [plaintiff], and although [the ALJ] appreciate[d] his concern for her well-being, his statements [we]re found unpersuasive for the reasons explained above." *Id.* at 46. It is within the ALJ's discretion to consider such evidence, and the Court identifies no abuse of that discretion in the ALJ's decision on this point. *See* 20 CFR § 404.1513(a)(4).

###### C.       The ALJ's Identification of Severe Impairments

Plaintiff's third challenge to the ALJ's decision is that "the ALJ committed reversible error by not considering all of the objective medical evidence" when finding that plaintiff's severe impairments did not include neuropathy, neuromuscular autoimmune disease, or disorders of the spine and neck. Pl. Br. at 17–19. Plaintiff's challenge, however, is not that the ALJ failed to consider key evidence in the record. Rather, plaintiff challenges the conclusions drawn therefrom.

The Court must reject plaintiff's argument on this point. In reviewing an ALJ opinion, the Court's function is not to "re-weigh conflicting evidence . . . or substitute [its] judgment for that of the [ALJ]." *Craig*, 76 F.3d at 589. Nor, when there exist "conflicts in the evidence," may the Court "second guess the ALJ in resolving those conflicts." *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018). The Court's duty, instead, is to determine whether the administrative record provides "substantial support" for the ALJ's decision. *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009). And where a challenge to the ALJ's decision relates to her identification of "severe impairments," there is no reversible error if "[a] review of the ALJ's decision *in toto* shows that, subsequent to h[er] analysis at Step 2, [s]he considered and evaluated all of [plaintiff's] . . . issues in determining whether [plaintiff's] impairment or combination of impairments functionally equaled a listed impairment." *Cook ex. Rel. A.C. v. Colvin*, Case No. 2:11-cv-362, 2013 WL 1288156, at *5 (E.D. Va. Mar. 1, 2013).

Here, the ALJ provided a detailed discussion of the medical records related to plaintiff's neck and spine disorders and then explained why plaintiff's medical records did not show that those disorders caused "severe impairments." AR at 34. The ALJ took the same approach with plaintiff's neuropathy and neuromuscular disorders. *Id.* In essence, the ALJ repeatedly identified one of plaintiff's impairments, summarized the associated medical records, and then explained

why she believed those records revealed "normal" findings, a lack of "demonstrated abnormalities," or "that no further intervention was necessary." *Id.* at 34.

By doing so, the ALJ provided substantial evidence for each impairment she deemed not severe. The Court can require nothing more. Regardless, the ALJ's subsequent discussion of plaintiff's condition shows that the ALJ considered medical opinions, personal testimony, and subjective statements regarding plaintiff's impairments (regardless of their severity) *in toto*. The Court, thus, finds no basis on this record to overturn the ALJ's enumeration of plaintiff's severe impairments.

### D.    The ALJ's RFC

Plaintiff next challenges the ALJ's RFC determination. Pl. Br. at 20–21. Specifically, plaintiff argues that the ALJ failed to address plaintiff's "ability to perform all the exertional and non-exertional demands of light work" on a regular and continuing basis. *Id.* at 20. Plaintiff also finds fault in the ALJ's conclusion that plaintiff would be "off task five percent of the time in an eight-hour workday due to fatigue." *Id.* The Court finds that plaintiff's arguments on this point do not warrant remand or reversal.

The RFC is based on "all of the relevant medical and other evidence." *Id.* § 404.154(a)(3). In determining an RFC, an ALJ is required to consider all "medically determinable impairments of which" she is aware, including "medically determinable impairments that are not 'severe.'" 20 C.F.R. § 404.1545(a)(2). The Fourth Circuit has held that an ALJ is not required to base an RFC assessment on a specific medical opinion, but instead on the record as a whole, including subjective complaints, objective medical evidence, and medical source opinion. *See Felton-Miller v. Astrue*, 459 Fed. App'x 226, 230–31 (4th Cir. 2011). It is the ALJ's exclusive duty as a fact finder to make an RFC assessment. *Astrue*, 459 Fed. App'x at 230–31; *see also* 20 C.F.R. § 404.1546(c).

To assist this Court in conducting its review of her RFC assessment, the ALJ must provide a "narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activity observations)." *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016). "In other words, a sufficient residual functional capacity analysis must include: '(1) evidence, (2) logical explanation, and (3) conclusion.'" *Jeffrey R.T. v. Saul*, Case No. 3:19-cv-752, 2021 WL 1014048, at *15 (E.D. Va. Feb. 25, 2021) (quoting *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019), *as amended* (Feb. 22, 2019)).

Here, the ALJ provided a narrative discussion supported by medical facts and nonmedical evidence. First, the ALJ found that plaintiff was capable of performing modified "light work as defined in 20 CFR 404.1567(b)." AR at 38. The demands of light work require plaintiff to "lift[] no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Additionally, "a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.*

The ALJ explained that plaintiff could lift the weight required for "light work" because "examinations have not revealed diminished strength in any area." AR at 46. Next, the ALJ reasoned that plaintiff could manage "a good deal of walking or standing," because plaintiff's "clinician[s] typically d[id] not indicate that [plaintiff] appeared uncomfortable standing or walking during appointments" and that "[w]hile orthostatic testing ha[d] shown some increase in [plaintiff's] heart-rate while standing, the fluctuations were often minimal and improved as [plaintiff] stood for longer periods." *Id.* As for plaintiff's ability to "sit[] most of the time with some pushing and pulling of arm or leg controls," the ALJ noted that "there is no objective

evidence showing that [plaintiff] has trouble sitting, which implies that she is capable of sitting for six hours in an eight-hour day." *Id.*

The ALJ supported her interpretation of the medical evidence on each point through reference to the consistent conclusions drawn by Drs. Godwin and McGuffin, who also found plaintiff capable of "lift[ing] and carry[ing] 20 pounds occasionally and 10 pounds frequently[,] . . . stand[ing] and walk[ing] about six hours in an eight-hour workday and sit[ting] about six hours." *Id.* In this way, the ALJ provided a narrative discussion explaining how she determined plaintiff was capable of performing light work. Plaintiff's only real challenge to this conclusion is to claim that the ALJ erred by relying on the opinions of Drs. Godwin and McGuffin. But as discussed, *supra*, the Court identifies no error in the ALJ's decision to assign "significant" weight to those doctors' opinions. The Court, thus, finds no merit to plaintiff's argument that the ALJ failed to adequately address plaintiff's ability to perform the requirements of light work on a regular and continuing basis.

The Court reaches the same conclusion for plaintiff's challenge to the "off task" rate. The law is clear: "plaintiff bears the burden of arguing that the substantial evidence supports a higher off task percentage" and cannot do so through "her own testimony." *Chandler v. Berryhill*, Case No. 1:17-cv-1346-JFA-CMH, 2018 WL 4346703, at *10 (E.D. Va. Jul. 26, 2018), *report and recommendation adopted*, 2018 WL 4344462 (E.D. Va. Sept. 11, 2018). Plaintiff has not done that here—writing only that "the ALJ failed to explain how [p]laintiff will only 'be off task five percent of the time in an eight-hour workday due to fatigue.'" Pl. Br. at 20 (quoting AR at 38). That is insufficient to rebut the ALJ's finding that plaintiff would "be able to remain on task 95 percent of the workday" despite "some limitations in her ability to concentrate." AR at 47. It is worth noting that the ALJ supported that finding with substantial evidence when she stated both that (1)

"providers do not describe increased distractibility [in plaintiff] during examinations," and (2) plaintiff's activities of daily life require her to "follow instructions or procedures, remain on task, work at an appropriate pace, and sustain some degree of attention and concentration." *Id.*

### E.    The ALJ's Compliance with SSR-14-1P

Plaintiff's final basis for appeal is that the ALJ purportedly failed to comply with the SSA's policy interpretation ruling for evaluating cases involving chronic fatigue syndrome ("SSR 14-1P"). *See* Pl. Br. at 21–27. "Had the ALJ used and applied the SSA rules for evaluating claimants with CFS," plaintiff argues, "[the ALJ] would have found [plaintiff] ha[d] a[ medically determinable impairment] of CFS based on" plaintiff's constellation of symptoms. Pl. Br. at 26–27. The record, however, reveals no such error. The ALJ did find that plaintiff suffered from CFS as a medically determinable impairment but found that impairment was not disabling. *See* AR at 34–50. The Court finds not basis to disturb that finding under SSR 14-1P.

SSR 14-1P gives the ALJ a roadmap for recognizing CFS in a plaintiff and "provides that the Commissioner will adjudicate claims involving CFS 'just as the Commissioner does for any impairment.'" *Harney v. Comm'r of Soc. Sec.*, Case No. 2:16-cv-340, 2017 WL 4325392, at *3 (M.D. Fla. Sept. 29, 2017) (quoting SSR 14-1P, 2014 WL 1371245, at *8 (Apr. 3, 2014)) (alterations adopted). Accordingly, SSR 14-1P directs that "an ALJ assess the RFC of a claimant with CFS 'based on all the relevant evidence in the record' pursuant to 20 CFR §§ 404.1545(a) and 416.945(a)." *Id.* (quoting SSR 14-1P, 2014 WL 1371245, at *9). Thus, SSR 14-1P requires the ALJ to assess plaintiff's CFS and RFC "'just as [she would do] for any impairment,' based on the entire record." *Harney*, 2017 WL 4325392, at *6 (quoting SSR 13-1P, 2014 WL 1371245, at *8). The Court finds that the ALJ did just that.

At step two of her sequential analysis, the ALJ identified "chronic fatigue syndrome" as one of plaintiff's "severe" "medically determinable impairments." AR at 34. At step three, the ALJ acknowledged that "[c]hronic fatigue syndrome . . . is not a listed impairment" and that the ALJ, therefore, must "determine whether this condition medically equals a listing, or whether it medically equals a listing in combination with at least one other medically determinable impairment." *Id.* at 38. The ALJ considered whether plaintiff's CFS was medically equivalent to musculoskelatal impairment, any neurological impairment, mental health disorders, or immune system disorder. *Id.* Upon finding that plaintiff's CFS did not (alone or in combination) equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix A, the ALJ nevertheless continued to consider plaintiff's CFS when formulating her RFC. *Id.* at 38–48 ("it is reasonable to find that the fatigue . . . associated with plaintiff's chronic fatigue syndrome . . . limit[s] her to work at the light exertional level and impact[s] her abilities to perform postural tasks, remain on tasks, and interact with certain environmental conditions").

In this manner, the ALJ extensively discussed plaintiff's symptoms and medical evidence related to her CFS and properly assessed plaintiff's RFC in light of the same. The Court is assured by its thorough review of the record and law that SSR 14-1P required nothing more. *See Podany v. Berryhill*, Case No. 17-cv-1008, 2018 WL 3574939, at *2 (W.D. Pa. Jul. 25, 2018) (finding no error where the ALJ adjudicated a claim involving CFS as it would "for any impairment" such that the ALJ "fully complied with the mandates of SSR 14-1P"); *see also Riedel v. Kijakazi*, Case No. 20-cv-1361, 2022 WL 613298, at *3 (E.D. Wis. Mar. 2, 2022) (rejecting argument that "because the ALJ found [plaintiff's] CFS to be a severe impairment, [ ] it must [have] be[en] disabling").

*     *     *

Accordingly, it is hereby ORDERED that plaintiff's Motion for Summary Judgment (Dkt. No. 15) is DENIED; it is further

ORDERED that defendant's Motion for Summary Judgment (Dkt. No. 17) is GRANTED and the Administrative Law Judge's decision is AFFIRMED.

The Clerk is directed to enter judgment in favor of defendant in accordance with Rule 58 of the Federal Rules of Civil Procedure.

It is SO ORDERED.


/s/
Michael S. Nachmanoff
United States District Judge


June 7, 2022
Alexandria, Virginia